2025 IL App (2d) 240433-U
No. 2-24-0433
Order filed July 10, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-CF-2698 |
| | ) | |
| JEFFERY M. THRALL, | ) | Honorable |
| | ) | Patricia S. Fix, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court properly suppressed defendant's statements where the police failed to scrupulously honor his clear and unambiguous invocation of his right to remain silent.

¶ 2    The State appeals, pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. Apr. 15, 2024), from an order of the circuit court of Lake County granting defendant Jeffery M. Thrall's motion to suppress inculpatory statements, including his admission that he stabbed his aunt, Nancy Wilcox, to death.  We affirm the trial court's grant of defendant's motion to suppress statements

because, during his custodial interrogation, defendant clearly and unambiguously invoked his right to remain silent, but the investigators failed to scrupulously honor that right.

¶ 3                                    I. BACKGROUND

¶ 4     On December 3, 2019, defendant was interrogated by investigators from the Lake County Major Crime Task Force in connection with Wilcox's murder, which occurred the prior day, December 2, 2019. During the interrogation, which was audio and video recorded, defendant made several inculpatory statements, including that he "beat the fuck" out of Wilcox and stabbed her "four or five" times with a large kitchen knife, causing her death. Defendant was subsequently charged by a grand jury with three counts of first-degree murder.

¶ 5     In September 2022, defendant's appointed counsel sought a fitness evaluation, which the trial court granted. The following month, the court found defendant unfit for trial and placed him in the custody of the Illinois Department of Human Services for treatment. Defendant received treatment and was eventually restored to fitness. On April 25, 2023, the court entered an order finding defendant fit to stand trial.

¶ 6                          A. Defendant's Motion to Suppress

¶ 7     On May 17, 2024, defendant filed a motion to suppress, arguing that he invoked his right to remain silent during his interrogation where, immediately "[a]fter *Miranda* rights were read to Defendant, he stated 'I really don't have nothing to say' " and shook "his head from side to side indicating he did not wish to speak to the investigators." He also pointed to three statements in which he said, "I really don't want to talk about it," or a slight variation of that phrase, when investigators asked him what happened when he arrived at Wilcox's home the night of the murder. Defendant contended that these statements and accompanying nonverbal conduct were clear and unequivocal assertions of his right to remain silent, which the investigators failed to honor.

¶ 8                              B.  Suppression Hearing and Video Evidence

¶ 9      On June 27, 2024, the trial court held a hearing on defendant's motion.  Investigator Jacob Vekemans testified that on December 3, 2019, officers of the Park City police department were dispatched to Wilcox's residence in connection with her murder.  They discovered that Wilcox's vehicle was missing and suspected that it was being driven by her killer.  The next morning, at approximately 6:00 a.m., police located the vehicle and conducted a traffic stop.  Defendant, the vehicle's sole occupant, was taken into custody, and a knife was found under the seat.

¶ 10     At approximately 6:45 a.m., defendant was placed in an interview room at the Lake County Sheriff's Office.  The room was equipped with audio and video recording capabilities, allowing investigators to monitor the room in real time via a closed-circuit television system.  At approximately 7:30 a.m., Vekemans remotely observed an evidence technician enter the room and collect defendant's clothing, which "had a dark substance spattered about *** that was indicative with blood splatter."  Defendant was provided with a change of clothes.  A second evidence technician later entered the room and, with defendant's consent, collected biological evidence from his hand and the inside of his cheek.

¶ 11     Vekemans testified that he and Deputy Lana LeMons, his partner for this investigation, entered the interview room at 8:03 a.m.  Vekemans testified that he began the interview by introducing himself to defendant, telling him that "we're going to be here for a little while," and stating that he would like to ask defendant a couple questions.  Vekemans testified that he read defendant his *Miranda* rights from a preprinted form, which was entered into evidence as People's Exhibit No. 1.  Vekemans identified both his own signature and defendant's signature on the form, noting that defendant signed it "immediately" after it was read to him.

¶ 12    Vekemans testified that all his interactions with defendant were recorded, and he identified People's Exhibit No. 2 as a true and accurate audio and video recording of the interview. The video was entered into evidence without objection and played for the court.

¶ 13    The video exhibit, which is imprinted with a time stamp, begins at 8:02:59 a.m. Defendant is seated in an interview room as Vekemans and LeMons enter. The investigators are dressed in plain clothes. Vekemans is carrying a cup of coffee and a breakfast sandwich, which he hands to defendant. Defendant takes a sip of coffee, unwraps the sandwich, and begins eating. Vekemans informs defendant that "since you're at a police department, I have to read you your rights, okay?" Beginning at 8:03:50, Vekemans reads *Miranda* warnings from a preprinted form and asks whether defendant has "any questions about that?" Defendant shakes his head from side to side and takes another sip of coffee. Vekemans states, "Okay," and presents the form to defendant, stating: "Would you mind just signing here saying that I just read this to you?" Defendant responds, "mm-hmm," places his coffee and sandwich on the table, and accepts a pen from Vekemans. Vekemans states, "I appreciate it." As defendant signs his name, Vekemans says, "I really appreciate you being cooperative with us, you know, I know that…" At 8:04:12, defendant, while still signing his name on the *Miranda* form, interrupts— "Not really. I don't have nothing to say,"[1] while

---

[1]We take this opportunity to note that the poor audio quality of the State's exhibit caused an unfortunate discrepancy in the record. Defendant alleged in his motion to suppress that, "[a]fter *Miranda* rights were read to Defendant, he stated 'I really don't have nothing to say.' " The report of proceedings demonstrates that both the State and defendant proceeded through the hearing under the erroneous belief that this was defendant's exact statement. However, upon careful review of the exhibit, we agree with the trial court that defendant's actual statement after Vekemans thanked him for "being cooperative" was: "Not really. I don't have nothing to say." The State conceded this point in its motion to reconsider, stating that

shaking his head from side to side. Vekemans responds, "Well, let's start with your name. Can we go with that?" Without answering, defendant finishes signing his name and hands the pen back to Vekemans. Vekemans then gestures toward the sandwich and tells defendant that he may continue eating. Defendant picks up the sandwich and resumes eating as Vekemans states that he would "ask [defendant] a couple questions as we go, if you don't mind."

¶ 14 Vekemans immediately begins to question defendant. He first asks him to spell his name and, while chewing, defendant provides the spelling. Upon additional questioning, defendant provides other identifying information, including his birth date and an address in North Chicago where he had once lived with his sister, Diana, and her daughter, Brittany.

¶ 15 In response to Vekemans' question regarding where he resided, defendant states that he was incarcerated for the past year and "just got out yesterday." Upon more questioning, defendant explains the events that led to his incarceration. He states that, after his mother passed away, defendant and his sister began fighting over a trust fund and their childhood home that their mother left to them. Wilcox, the victim in this case, controlled the trust. Defendant asserts that his sister

---

it had conducted "[a]n attentive viewing and listening of the interview in ideal conditions," including with the use of headphones. Additionally, we note that the video and audio appear slightly out of sync, with a delay of one to two seconds between the audio and video tracks. We urge law enforcement agencies and the State to take all reasonable measures to ensure that the quality of recorded interviews is sufficiently clear and intelligible. Given the sophistication and accessibility of modern technology, producing clear and reliable interview recordings should be a routine and achievable standard for all law enforcement agencies. Such recordings are necessary for courts and counsel to fully understand the circumstances and content of custodial interrogations, safeguard constitutional rights, and promote transparency in the administration of justice.

squandered all her money and asked him for money, which he refused, and that his niece stole money from him. An argument ensued, police were called, and defendant's sister falsely accused him of beating her. Wilcox sided with defendant's sister and "backstabbed" him. Defendant was arrested, and his attorney "tricked" him into pleading guilty by telling him that he would be permitted to return to the home upon release. However, the judge "kicked [him] out of [his] house" and entered an order of protection. Defendant further explains that his Aunt Maxine passed away while he was incarcerated and left him $150,000, but Wilcox gave the money to defendant's attorney. Defendant also claims he was "tortured mentally" while he was incarcerated and that he "just snapped" because he was in jail "for no reason." He "prayed to God every day that [he] would die in [his] sleep."

¶ 16 Upon further questioning, defendant details his movements after he was released from prison the previous day. He first walked to the home of someone he had met in prison who had also recently been released and had offered to house him, but that person was not home. Defendant then walked to his North Chicago address, arriving at about 1:30 p.m., and "was scoping that out." He also purchased a six-pack of beer and sat by a bicycle path, drinking and gathering his thoughts. He explains that he "was freezing to death." After finishing the beer, he returned to his North Chicago house hoping to "sneak in" when his niece returned with her daughter from school. However, that plan failed because, according to defendant, there was a "big old black dude staying in there," and defendant "didn't want to hassle with him."

¶ 17 Afterward, defendant walked to a bar on Eleventh Street owned by a guy he knew, hoping the individual might "have some ideas" for him "because nothing was working out and [he] couldn't sleep outside." The individual told defendant that he could not give him any money, which offended defendant. Defendant explains to the investigators that he was not looking for a

handout, that he had a trust fund, and that he would not typically ask for help. Defendant stated he was "sorry [he] bothered" asking the individual for help. He then states that he "walked all the way to Park City."

¶ 18    Vekemans asks defendant if, at that point, he went to Wilcox's house. Defendant replies, "Yeah, but she wouldn't answer the door, and I just snapped." Vekemans asks, "And then what happened after that?" Defendant repeats, "I just snapped," and, at 8:20:33, states "I really don't want to talk about it," while shaking his head from side to side. Vekemans responds, "No, I understand. But what made you snap?" LeMons states: "We don't blame you." Defendant reiterates that he "just snapped" and states that his "brain was frozen" and he did not "remember a whole lot." He states that he "really wanted Brittany's ass" and that if he had "snapped" at his house he would have gone "right through that window." Defendant then states, three times in rapid succession, "I just snapped," then adds, "Everything that they did to me just came down on me and I was freezing, and I thought I was going to die." Defendant also states that he had nowhere to go, did not know where he would sleep, and he could not walk anymore because his feet were numb. Defendant again repeats, "I just snapped." Vekemans states that he could tell defendant was a "proud man" who would not ordinarily ask for help, and he sympathized with defendant because everyone defendant asked for help turned him down, stating, "a man can only take so much." Defendant then states that it would "be fine" if he is given the death penalty.

¶ 19    LeMons steers the conversation back to the homicide and asks defendant what happened when he arrived at Wilcox's home. At that point, defendant states that he "pounded on the door and they acted like they didn't hear me." Defendant surmises that his sister warned Wilcox that he would try to go to her house, and states "they conspired against me." LeMons asks defendant how he got inside Wilcox's house, and defendant answers that he broke a window. Vekemans

asks defendant what happened when he entered the home and, at 8:22:20 on the video, defendant again shakes his head from side to side and states, "I really don't want to talk about it." Vekemans responds: "No, no, I understand, but, you know, it helps us understand," and LeMons states, "We get it. We get why you did it." Defendant again shakes his head from side to side and states that he is "going to get the death penalty anyway," and LeMons points out that there is no death penalty in Illinois and states that defendant "got fucked by everybody." At 8:22:37, defendant again states, "I really don't want to talk about it." Vekemans responds: "No, no, it's okay. I understand."

¶ 20    Defendant states that he "fucked up," and he "prayed to God every day not to let this happen." Vekemans responds, "Well, I understand, Jeff, that you don't want to talk about it specifically, and I get that, but can you just…" Defendant laments that he could not "get the Lord to listen," and Vekemans reassured him that it sometimes "takes [God] a little while to get his shit together." Defendant replies that it would be a "little late now." Vekemans replied "I know you don't want to talk specifically about what happened, but uh…" Defendant, at that point, interrupts Vekemans and states that he "beat the fuck out of her." Defendant states that he accused Wilcox of "fucking [his] life up with Diana," and that Wilcox "got violent." Defendant proceeds to describe a physical fight with Wilcox that "just got out of control." Vekemans asks defendant how the fight ended, and defendant does not immediately answer. Vekemans shrugs his shoulders and states, "Jeff, I know we're not beating around the bush here. I mean, we all know what we're talking about." Defendant then looks up at Vekemans and states, "I stabbed her." Upon further questioning, defendant confesses that he stabbed Wilcox four or five times before fleeing the scene in her vehicle.

¶ 21    After the video was played for the court, Vekemans resumed his testimony and offered his interpretation of several statements defendant made during the interview. The State first directed

him to the beginning of the recording and replayed it from 8:03:56 to 8:04:16. Vekemans acknowledged that, immediately after reading defendant his *Miranda* rights and thanking him for cooperating, defendant stated, "I really don't have nothing to say." However, Vekemans testified that he did not believe the statement constituted an invocation of the right to remain silent, but rather, he interpreted it to mean that defendant "was not emotionally prepared to talk about the egregiousness of the incident." He also acknowledged that defendant shook his head when he made that statement, but Vekemans believed it "was part of [defendant's] mannerisms—to shake his head in various directions."

¶ 22     The State then directed Vekemans to a second portion of the interview and replayed the video from 8:20:18 to 8:22:51, beginning with Vekemans asking defendant what happened when he arrived at Wilcox's house. Vekemans acknowledged that, within this video segment, defendant stated, "I really don't want to talk about this," followed twice later by, "I really don't want to talk about it." However, he took these statements to mean that "defendant was still emotionally processing the incident," which had occurred only eight hours earlier. He believed defendant was not yet ready to talk about the murder itself, rather than indicating a desire to end the interview altogether. Vekemans also agreed that defendant shook his head when he made these statements but emphasized that he did not view the gesture as a definitive "yes-or-no answer," noting that defendant "shook his head throughout the entire conversation in a variety of ways." He acknowledged that defendant's comments reflected reluctance to discuss his entry into the home, but he emphasized that, despite those comments, defendant continued to participate in the conversation. According to Vekemans, because defendant kept speaking, he believed defendant was willing to continue with the interview.

¶ 23    Vekemans agreed that, around the 8:20:18 mark, after defendant stated he "just snapped" and did not want to talk about it, Vekemans responded, "No, I understand.  But what made you snap?"  He testified that this follow-up question reflected his understanding that defendant did not want to talk about the act itself, which he acknowledged was understandable.  He testified, "I don't think anybody would want to talk about it, but he obviously had the ability to."  Vekemans then explained that, at approximately 8:22:17, when he asked defendant what happened when he entered Wilcox's home, defendant stated, "I really don't want to talk about it" while shaking his head.  Vekemans did not consider that an invocation of the right to remain silent, however—only that defendant "did not want to talk about what occurred inside the trailer."  Vekemans acknowledged that he and LeMons began to talk over each other at that point, and about 15 seconds later, defendant again stated, "I really don't want to talk about it."  Vekemans recalled responding, "no, it's okay, I understand," as well as saying "I understand, Jeff, that you don't want to talk about it specifically, and I get that."  He explained that these statements were meant to convey empathy and an understanding of why defendant would not want to talk about the specific events that occurred inside Wilcox's home.  Vekemans further testified that, had defendant stated he wished to remain silent and not speak with them, he would have immediately terminated the interview.

¶ 24                    C. Trial Court's Ruling Granting Suppression

¶ 25    On July 1, 2024, the trial court granted defendant's motion to suppress statements.  In announcing its ruling, the court first outlined the background of the investigation.  It noted that, on December 3, 2019, police were dispatched to Wilcox's home in Park City in response to a homicide.  Defendant was arrested at approximately 6:00 a.m. the next morning while driving Wilcox's vehicle, which had a knife under the seat.  The court then described the interaction between the investigators and defendant during his interview at the Lake County Sheriff's Office.

After discussing the interview in detail, the court found that defendant unequivocally and unambiguously invoked his right to remain silent four separate times during the videotaped interview—once at the outset and three additional times, in quick succession, when he was asked about what occurred after he arrived at Wilcox's home.

¶ 26    Specifically, the trial court found that defendant first invoked his right to remain silent when, in response to Vekemans thanking him for "being cooperative," defendant interjected, "not really. I don't have nothing to say," while signing the *Miranda* form. The court observed that a "question-and-answer colloquy" then followed, beginning when Vekemans asked defendant to spell his name and provide his date of birth. The court noted that, at that point, "a conversation begins, not about the first-degree murder offense," but about defendant's family history, his financial difficulties, and his recent incarceration, which he believed was unjust and from which he had been released just the day before.

¶ 27    The trial court found that defendant invoked his right to remain silent three more times within a roughly two-minute span beginning at 8:20:33, when Vekemans asked defendant what happened after he arrived at Wilcox's home, and she would not answer the door. The court noted that, in response, defendant stated, "I really don't want to talk about it," or a slight variation of that phrase, at approximately 8:20:33, 8:22:20, and 8:22:37, each time shaking his head. The court also considered the context in which defendant made these statements and concluded that the surrounding circumstances did not favor the State. The court observed:

> "The defendant was willing to talk about any number of things that did not relate to the offense for which he was charged. He was willing to talk about his beef with his old attorney. He was willing to talk about the issues he had with money, who had some of his money based on his parents passing away; but what he was not willing to talk about, when

he said 'I really don't want to talk about this,' every time the police officers began and attempted to initiate a discussion about the first-degree murder, the defendant's clear, bright line was, 'I don't want to talk about this.' "

The trial court observed that each time defendant invoked his right to remain silent, he simultaneously shook his head. As the investigators continued to question him regarding what occurred inside Wilcox's residence, defendant was "shaking his head again more definitively." In the court's view, this nonverbal conduct likewise "clearly indicated a desire to end questioning."

¶ 28    The trial court also offered its general observations about the interview. It noted that defendant was not left to sit alone in an empty room for a prolonged period, and that the length of the interview itself was not unduly burdensome. The court observed that defendant "did not appear to be exceptionally tired," and he "appeared to be with it." It noted that neither the investigators nor defendant raised their voices during the interrogation. However, the court emphasized that the relatively brief, non-confrontational nature of the interview did not mean that defendant did not invoke his right to remain silent. It reiterated that, in four instances, defendant clearly indicated a desire to end questioning—both verbally and through nonverbal conduct—which the officers failed to honor.

¶ 29                         D.  State's Motion to Reconsider

¶ 30    On July 16, 2024, the State filed a motion to reconsider and reopen proofs, arguing that the trial court had not considered the entirety of defendant's initial purported invocation of his right to remain silent, which occurred immediately after Vekemans provided defendant *Miranda* warnings. The State asserted that, following the court's grant of defendant's motion to suppress, "the People relistened to the recording *** and, for the first time, heard what the Court must have heard in the recording, in that the defendant did in fact say 'Not really.  I don't have nothing to say.' "  The

State continued that, "[a]n attentive viewing and listening of the interview in ideal conditions, preferably with headphones, the video actually captures the defendant responding *** '*Not really. I don't have nothing to say.* **I don't know**.' " (Emphasis in original.) According to the State, the court failed to consider defendant's complete statement, including the phrase "I don't know," which immediately followed what the court had interpreted as an unambiguous invocation of defendant's right to remain silent. The State argued that this additional language required the court to reevaluate defendant's full statement, which it claimed, "was actually far more ambiguous" than previously thought, and it prayed that the court reopen the proofs "for the People to highlight this relevant portion of the recording."

¶ 31                       E. Trial Court's Denial of Reconsideration

¶ 32    On July 22, 2024, at the hearing on the motion to reconsider and reopen proofs, the State requested that the court admit People's Exhibit No. 3, which it asserted was a better-quality recording of the interview.[2] It explained that the video admitted at the suppression hearing was "a screen grab" as opposed to the raw, original file, which the State believed "compromised the audio a little bit." The State later clarified that it was not seeking to introduce "a new video," but rather, a copy of the original video "that doesn't have any other audio issues." It opined that, regardless, the court could re-watch the video that it had already admitted into evidence at the suppression hearing, and it would hear defendant state, "I don't know." In opposition, defendant argued that re-opening the proofs in cases where the moving party had already received an adverse ruling, and where the evidence sought to be introduced was available at the original hearing, should be

_____

[2]At oral argument, counsel for the State questioned whether "a better quality video" existed and indicated his understanding that the prosecutor "went back and listened to it with better headphones and better equipment."

permitted only as necessary to protect the integrity of the judicial system. Defendant also disputed the State's assertion that the proposed exhibit was of superior quality as compared to the video already considered by the court at the suppression hearing. Defendant also noted that, at the initial hearing, Vekemans did not testify that defendant said, "I don't know," and defendant asserted that the State's arguments contradicted both Vekemans' testimony and the arguments it made at the suppression hearing.

¶ 33    The trial court denied the State's motion to reconsider and reopen the proofs. In explaining its ruling, the court rhetorically questioned why the State waited so long to determine the exact words defendant used during his *Miranda* statement, emphasizing that over four years had passed between defendant's interview and the suppression hearing. It noted that the State only discovered the purported discrepancy after it received an adverse ruling. The court further found that the new interpretation of defendant's statement would unfairly surprise defendant, especially considering that neither the State nor defendant had argued at the suppression hearing that defendant stated, "I don't know." The court also emphasized that Vekemans did not so testify. The court concluded that the State's failure to introduce this evidence earlier was not inadvertent and that no reasonable explanation was offered for the delay. Instead, the State appeared to be advancing a "new argument" to cure a defect identified by the court in its original ruling, which the court explained would be improper.

¶ 34    On July 22, 2024, the State filed a certificate of impairment and a timely notice of appeal.

¶ 35                                II. ANALYSIS

¶ 36    On appeal, the State contends that the trial court erred by granting defendant's motion to suppress his inculpatory statements because defendant did not unequivocally and unambiguously invoke his right to remain silent during the interrogation. The State asserts that the interview,

when viewed in context, reflects that defendant was "engaged in an ongoing, free-flowing, and continuing conversation with the police," without ever invoking his right to remain silent.

¶ 37                                    A.  Standard of Review

¶ 38    As a threshold matter, we note that the parties appear to dispute the appropriate standard of review applicable to this appeal.  In its opening brief, the State suggests that we should apply the *de novo* standard to all the trial court's rulings, including its factual findings, because the findings were based primarily on the videotaped interview—evidence that the appellate court is equally capable of evaluating.  See *People v. Flores*, 2014 IL App (1st) 121786, ¶ 35 (applying *de novo* review where the appellate court viewed the same police interrogation video as the trial court, and no live testimony was presented at the suppression hearing).  Defendant, however, asserts that we should apply a bifurcated standard of review, deferring to the trial court's factual findings, because its evaluation of the video was colored by Vekemans' live testimony at the suppression hearing.

¶ 39    We agree with defendant.  Although the State correctly observes that a reviewing court may conduct *de novo* review of a trial court's factual findings when those findings are based entirely on videotaped evidence, that is not the case here.  The videotaped interview forms a significant part of the record in this case, but the State overlooks that the trial court's ruling was also shaped by Vekemans' live testimony at the hearing.  When a trial court's factual determinations are informed, even in part, by its assessment of witness credibility and demeanor, deference to those findings is appropriate.  See *People v. Valle*, 405 Ill. App. 3d 46, 58 (2010) (applying bifurcated standard where "live testimony had a role in resolving a disputed issue of fact").  Accordingly, we apply the familiar bifurcated standard of review to the court's ruling on the motion to suppress.  See *People v. Tucker*, 2022 IL App (1st) 172982, ¶ 36.  Under this

standard, the trial court's factual findings and credibility determinations are accorded great deference and will not be disturbed on appeal unless they are against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if the finding is unreasonable, arbitrary, or not based on the evidence, or if the opposite conclusion is clearly evident. *People v. Cox*, 2023 IL App (1st) 170761, ¶ 42. Still, we review *de novo* the trial court's ultimate legal conclusion as to whether suppression was required. *Id.* We now turn to the merits.

¶ 40        B. Legal Standards Governing Suppression of Statements

¶ 41    Both the United States and Illinois Constitutions provide that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. To safeguard the right against self-incrimination, an accused must be advised prior to any custodial interrogation of certain rights, including the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 471 (1966). An accused may invoke his right to remain silent either verbally or through conduct that clearly indicates a desire for all questioning to cease. *Flores*, 2014 IL App (1st) 121786, ¶ 37 (citing *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005)); see also *People v. Nielson*, 187 Ill. 2d 271, 287 (1999) (finding that the defendant invoked his right to remain silent when he placed his hands over his ears, looked up at the ceiling, and chanted, "nah nah nah"). If exercised verbally, the demand to end the interrogation must be specific. *Flores*, 2014 IL App (1st) 121786, ¶ 37.

¶ 42    However, the invocation of the right to remain silent must be unambiguous, unequivocal, and clear. *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 33 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). An interrogation "must cease once the individual indicates in any manner and at any time prior to or during a custodial interrogation that he wishes to remain silent." *Flores*, 2014 IL App (1st) 121786, ¶ 37. In assessing whether an accused has invoked his right to

remain silent, the statements must be examined in the factual context of their utterance. *People v. Milner*, 123 Ill. App. 3d 656, 660 (1984). Whether a statement constitutes a clear and unequivocal assertion of the right to remain silent is an objective inquiry and depends on how a reasonable police officer would have perceived the defendant's statement. See *Davis v. United States*, 512 U.S. 452, 459 (1994). Nevertheless, an interrogator's response to the statement may assist in determining whether an invocation of the right was clear and unambiguous. *People v. Ward*, 2023 IL App (1st) 190364, ¶ 116 (citing *Nielson*, 187 Ill. 2d at 287). Any statement obtained after the person has invoked his right to remain silent "cannot be other than the product of compulsion, subtle or otherwise." *Hernandez*, 362 Ill. App. 3d at 785 (quoting *Miranda*, 384 U.S. at 474). When a defendant files a motion to suppress his statements to the police, "the State has the burden of proving the confession was voluntary by a preponderance of the evidence." *Ward*, 2023 IL App (1st) 190364, ¶ 100 (quoting *Flores*, 2014 IL App (1st) 121786, ¶ 36).

¶ 43        C. Defendant's First Invocation of Right to Remain Silent

¶ 44    We determine that defendant clearly and unambiguously invoked his right to remain silent. As noted, the video begins with defendant seated in an interview room as Vekemans and LeMons enter. Vekemans confirms defendant's food order and hands him a breakfast sandwich and a cup of coffee. Defendant takes a sip of coffee, unwraps the sandwich, and begins eating. Vekemans explains to defendant, "Since you're at a police department, I have to read you your rights, okay?" He proceeds to read defendant his *Miranda* rights from a preprinted form. After doing so, Vekemans asks whether defendant has any questions. Defendant does not respond verbally but shakes his head from side to side and then takes another sip of coffee. Vekemans, apparently interpreting defendant's side-to-side head shake as a negative response, states. "Okay." He then

slides the *Miranda* form across the table to defendant and hands him a pen. The following exchange then occurs:

> VEKEMANS: Would you mind just signing here saying that I just read this to you?
>
> DEFENDANT: Mmmhmm. [Defendant begins to sign his name].
>
> VEKEMANS: I appreciate it. Je—I really appreciate you being cooperative with us, you know, I know that—
>
> DEFENDANT: [Shaking head] Not really. I don't have nothing to say.
>
> VEKEMANS: Well, let's start with your name. Can we go with that?
>
> DEFENDANT: [No Response]. [Defendant finishes signing his name, hands the pen back to Vekemans, and picks up the sandwich].
>
> VEKEMANS: [Gesturing toward the sandwich]. You can just have your sandwich, and I'll ask you a couple questions as we go if you don't mind.

Vekemans then asks defendant to spell his name. Defendant takes another bite of the sandwich and, while chewing, spells his first and last name. Vekemans proceeds to question defendant, not about Wilcox's murder, but about his birth date, prior address, finances, and family dynamics.

¶ 45    Defendant's statement, "Not really. I don't have nothing to say," was a clear and unequivocal invocation of his right to remain silent. It was made immediately after Vekemans read defendant his *Miranda* rights and thanked him for "being cooperative" with the investigators. In direct response, at 8:04:12, defendant interrupted and stated, "Not really. I don't have nothing to say," while shaking his head from side to side—a gesture that is widely recognized as signifying "no." This was defendant's first substantive statement, which served as a clear, preemptive declaration that he simply did not wish to cooperate with their investigation.

¶ 46    The trial court correctly recognized that defendant's statement closely tracked, if not mirrored, language that appellate courts have deemed sufficient to invoke the right to silence. See *Ward*, 2023 IL App (1st) 1903604, ¶ 102 ("I ain't got nothin' else to say"; "[g]ot nothin' to say"; and "don't want to say nothing else about it"); *Cox*, 2023 IL App (1st) 170761, ¶¶ 45, 52 ("I don't wanna answer no more questions, 'cause I can't help you. And I don't wanna dig myself into a hole"); and *Flores*, 2014 IL App (1st) 121786, ¶ 55, 57 ("[n]ot really, no," said immediately after *Miranda* rights were provided in response to an inquiry whether the defendant wished to speak with investigators, as well as "ain't gonna say nothing about nothing").

¶ 47    The timing of defendant's statement is also significant. It immediately followed his receipt of the *Miranda* warnings and was spoken as he signed the form that Vekemans presented to him. Vekemans' expression of appreciation—"I really appreciate you being cooperative with us"—was met with an immediate negation from defendant, "Not really. I don't have nothing to say," thereby distancing defendant from any implication of cooperation. Our supreme court has made clear that while the primary focus "should remain on the nature of the actual statement at issue," the trial court "may consider the proximity between the *Miranda* warnings and the purported invocation of the right to counsel in determining how a reasonable officer in the circumstances would have understood the suspect's statement." *In re Christopher K.*, 217 Ill. 2d 348, 381 (2005). Here, defendant's invocation was immediate. See *Flores*, 2014 IL App (1st) 121786, ¶ 55 (noting the defendant replied "Not really, no" immediately after he was given *Miranda* rights and asked whether he wanted to speak with the detectives). See also *Berghuis*, 560 U.S. at 381 ("there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel").

¶ 48    Given this context, defendant's verbal statement, accompanying nonverbal gesture, and the timing of both, can reasonably only be interpreted as a refusal to cooperate with the investigators and a clear invocation of his right to remain silent. See *People v. Diaz*, 377 Ill. App. 3d 339, 347 (2007) ("This right to silence may be invoked either verbally or through conduct that clearly indicates a desire to end all questioning").

¶ 49    On appeal, the State appears to argue that defendant's invocation of the right to remain silent was ineffective because Vekemans did not treat it as such. See *Ward*, 2023 IL App (1st) 190364, ¶ 116 ("a questioning officer's reaction to a purported invocation is often relevant" (citing *Nielson*, 187 Ill. 2d at 287). It points to Vekemans' responses, "Well, let's start with your name. Can we go with that?" and "I'll ask you a couple questions as we go if you don't mind," and asserts that those comments were good-faith attempts to clarify defendant's "ambiguous statement" and discern whether defendant had, in fact, invoked his right to remain silent.[3] The State further argues that, because defendant did not affirmatively reply that he did not wish to answer any questions, but instead "began calmly answering the questions posed to him by the investigators," a reasonable officer would not have understood defendant's statement as an invocation of the right to silence. We disagree.

---

[3]Vekemans did not testify that he believed defendant's initial statement was ambiguous. Rather, he interpreted defendant's statement as indicating "that he was not emotionally prepared to talk about the egregiousness of the incident." On appeal, the State characterizes the interview as a single, continuous exchange, and that defendant's statements reflected defendant's "reluctance to convey to the officers all the details of the offense." Of course, at this very early point in the interview, the investigators had not questioned defendant regarding Wilcox's murder, let alone asked him for any "details."

¶ 50    The State's argument is circular because it treats Vekemans' decision to continue questioning defendant, not as a failure to scrupulously honor defendant's right to remain silent, but as evidence that no violation occurred at all.  While an officer's reaction may be relevant to the analysis, it cannot be used to retroactively invalidate an otherwise clear invocation of the right to remain silent.  See *Nielson*, 187 Ill. 2d at 287 (officers' reaction—immediately ceasing interview and returning the defendant to his cell—after the defendant covered his ears, looked at the ceiling, and chanted 'nah nah nah,' bolstered court's determination that the defendant had invoked his right to remain silent).  Here, the State appears to use Vekemans' decision to press forward with the interview as a measure of defendant's clarity in invoking his right to silence.  However, the question is not whether the investigator honored the invocation, but rather, whether a reasonable investigator under the circumstances would have understood defendant's statement as an unequivocal invocation of that right.  See *Davis*, 512 U.S. at 459; *Tucker*, 2022 IL App (1st) 172982, ¶ 47.

¶ 51    Moreover, nothing required defendant to repeatedly invoke his right to remain silent before the investigators would be obligated to honor it.  The State emphasizes that defendant "freely answered [the investigators'] questions and never indicated that he did not wish to speak with them."  The State, however, advocates for an overly rigid view of what constitutes a valid invocation of the right to silence.  It is well settled that there are no magic words to invoke the privilege.  "[N]o ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination.  All that is necessary is an objection stated in language that [an interrogator] may reasonably be expected to understand as an attempt to invoke the privilege." *Emspak v. United States*, 349 U.S. 190, 194 (1955).

¶ 52    Given the clarity of defendant's invocation, Vekemans' follow-up responses were unwarranted and inappropriate. There was simply nothing for him to clarify. Vekemans' remarks, while phrased politely, were not genuine clarification questions. A true clarifying inquiry would have addressed defendant's statement, such as asking, "Do you mean you don't want to talk to us?" or "Do you wish to remain silent?" Instead, Vekemans framed his response as a soft transition into continued questioning. He did not end the interview or ask defendant directly whether he did not wish to proceed; He simply sidestepped defendant's clear invocation and began the interview with language that assumed defendant's consent rather than confirmed it.

¶ 53    Defendant's responsiveness to questioning that did not pertain to the investigation into Wilcox's murder, such as regarding his living situation, family dynamics, finances, and the circumstances that led to his recent incarceration, does not alter the analysis. Once a person invokes his or her right to silence, the person "can control the time at which questioning occurs, *the subjects discussed*, and the duration of the interrogation." (Emphasis added.) *Michigan v. Mosley*, 423 U.S. 96, 103-104 (1975). Moreover, "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Flores*, 2014 IL App (1st) 121786, ¶ 38 (quoting *Smith v. Illinois*, 469 U.S. 91, 100 (1984)).

¶ 54    The State describes this portion of the interview as depicting defendant "engag[ing] in a very calm conversation, *** freely answer[ing] their questions." This characterization is overly charitable to the State's position, because defendant's responses to the investigators' initial questions were terse and limited to just a few words. For instance, defendant provided his former address only in fragments—requiring Vekemans to ask several follow-up questions—first eliciting only the house number, then the street name, and finally the town.

¶ 55    Vekemans eventually steered the conversation into rapport building and offered emotionally validating commentary.  Indeed, defendant responded with complete sentences only after Vekemans asked about his mother's passing and the resulting conflict with his sister concerning their mother's estate, which culminated in defendant's recent incarceration.  Instead of honoring defendant's invocation, Vekemans advanced the conversation by asking him about the circumstances that led to defendant's prior arrest, discussing those circumstances in detail, and sympathizing with him.  Vekemans explained that defendant was "just getting fucked all around," "definitely got a raw deal," and that defendant's recent incarceration "seems like it was bullshit." At one point, defendant stated that he was "tortured mentally" in prison, and Vekemans expressed sympathy, stating he could not "imagine what [defendant] went through."  While such techniques are common in interrogation settings to encourage conversation (see *McGraw v. Holland*, 257 F.3d 513, 519 (2001) (detective was "very sympathetic" and "obviously believed that she could catch more flies with honey than with vinegar")), their use here was inappropriate.  Once defendant invoked his right to silence, the investigators were required to scrupulously honor that right by ceasing all questioning.  *Mosley*, 423 U.S. at 103-104.

¶ 56    The State also contends that defendant's statement, "Not really.  I don't have nothing to say," was ambiguous because it was followed by an additional phrase—"I don't know."  The State invites this court to independently review the video and discern that phrase.  See *Flores*, 2014 IL App (1st) 121786, ¶ 35 (applying *de novo* review to trial court's suppression ruling because trial court reviewed recordings of the interrogation, which the appellate court was equally capable of assessing).  We have carefully viewed the video numerous times, including with the use of headphones, and can conclude only that the words following defendant's invocation are indistinct. To our ears, the phrase more plausibly sounds like "you know," which is a verbal filler that mirrors

the language that Vekemans himself had used twice in the seconds immediately preceding the interruption. Defendant also used that phrase several times later in the interview. We decline to assign value to indistinct audio that was not acknowledged by Vekemans in his testimony and was raised by the State only after it had received an adverse ruling. Such speculation cannot cast doubt on an otherwise clear invocation of defendant's right to remain silent.

¶ 57          D. Defendant's Subsequent Invocations of Right to Remain Silent

¶ 58    Defendant also clearly and unequivocally invoked his right to remain silent later in the interview through repeated verbal statements and nonverbal cues. After defendant detailed the events that led to his recent incarceration, Vekemans pivoted the conversation to defendant's movements following his release from jail the prior day. Defendant explained that he first went to the home of an acquaintance he had met while incarcerated and who had offered him a place to stay, but that person was not home. Defendant then walked to his former home in North Chicago, arriving at approximately 1:30 p.m., where he surveilled the property. He purchased beer and sat near a bicycle path to drink and collect his thoughts, telling the investigators that he was "freezing to death." After finishing the beer, he returned to the North Chicago address hoping to enter unnoticed, but he abandoned that plan after seeing someone he did not recognize staying at the house. Defendant told the investigators that he then walked to a bar owned by an acquaintance, hoping that he might offer advice or assistance because "nothing was working out" and defendant had nowhere to stay. The acquaintance declined to help defendant, and so, when it was "pretty late," defendant "walked all the way to Park City."

¶ 59    At that point, the following colloquy occurred:[4]

---

[4]A verbatim transcript is not included in the record on appeal. However, this court has reviewed

VEKEMANS: Is that when you went to Nancy's house?

DEFENDANT: Yeah, but she wouldn't answer the door, and I just snapped.

VEKEMANS: And then what happened after that?

DEFENDANT: I just snapped. [Shaking head from side to side]. I really don't want to talk about it.

VEKEMANS: No, I understand. But what made you snap?

LeMONS: We can't—We don't blame you.

DEFENDANT: I know. I just—I just snapped. I was—My brain was frozen.

VEKEMANS: Sometimes you just go black, right? I mean, we've all been there.

DEFENDANT: I don't even remember a whole lot. But I just—I really wanted Brittany's ass. But I guess I didn't snap enough back—because if I would have snapped over at my house I would have gone right in through that window. I just snapped, you know? I just—I just snapped. I just snapped. Everything—everything that they did to me just—

VEKEMANS: All came down at once, huh?

DEFENDANT: —came down on me and I was freezing. I thought—I thought I was gonna die. I didn't have nowhere to go. I didn't know where I was gonna sleep, you know? And I couldn't walk anymore. My feet were numb. I just snapped, you know? I just—

---

the recording of the interview and has independently prepared a transcript of this portion of the interview based on its careful observation and review. The State included its own partial transcript in the argument portion of its appellate brief, which is substantively the same as that prepared by this court.

VEKEMANS: Well, just hearing your story, I can sympathize with you. I mean, I get it, man. It seems like everybody that—You seem like a proud man, not a man that would go and ask for help, and the few people that you did ask for help kind of turned you out, I mean, you can—a man can only take so much.

DEFENDANT: They can give me the death penalty, and that'll be fine.

VEKEMANS: Well—

LeMONS: You—Sorry.

VEKEMANS: No, go ahead, Lana.

LeMONS: You—obviously when you got over to Nancy's house, did you knock on the door and she just wouldn't let you in, or—?

DEFENDANT: I pounded on the door, and they acted like they didn't hear me. I'm sure Diana told her I was going to try to be there. Maybe they conspired against me.

LeMONS: And then, how did you end up getting into Nancy's house?

DEFENDANT: I broke through the window.

LeMONS: Did you break the window and go in? Or was it open?

DEFENDANT: No, I broke it.

LeMONS: Ok. You broke it and went inside?

DEFENDANT: [No response].

VEKEMANS: What happened when you got inside?

DEFENDANT: [Shaking head] I—I really don't want to talk about it.

VEKEMANS: No, no, I understand, but, you know—

LeMONS: Jeff, sometimes it— it helps—and we—

VEKEMANS: It helps us understand.

LeMONS: We get it.  We get why you did it.

DEFENDANT: I'm going to get the death penalty anyways.

LeMONS: This is Illinois.  They don't have that.

VEKEMANS: Well, Jeff, I don't want to—

[All three speaking at once]

LeMONS: And you got fucked by everybody.  We're not trying to—

DEFENDANT: [Shaking head] I really don't want to talk about it.

VEKEMANS: No—I—it's ok.  I understand.  Um—

DEFENDANT: I fucked up.  You know, I prayed to God every day not to let this happen.  [Inaudible] not even God to listen to me, so—

VEKEMANS: Well, I understand, Jeff, that you don't want to talk about it specifically, and I get that, um, but can you just—

DEFENDANT: God damn, I can't even get the Lord to listen to me, that's bad.

VEKEMANS: Well, sometimes it just takes him a little while to get his shit together, you know.

DEFENDANT: Yeah, well, a little late now.

VEKEMANS: He's got a lot of people to listen to, you know?  Um, can you just— I know you don't want to talk about specifically what happened but, um, can you just tell me—

DEFENDANT: I beat the fuck out of her.  Like, I accused her of fucking my life up with Diana and that, and she got violent.  It just got out of control.  [Defendant rubs right side of his forehead].

VEKEMANS: Did she hit you?

DEFENDANT: Yeah.

VEKEMANS: What happened to your head?

DEFENDANT: She fucking clocked me with something. I think it was the oven thing.

VEKEMANS: Oven thing?

DEFENDANT: You know, the—

VEKEMANS: Like the steel grate thing?

DEFENDANT: Yeah.

VEKEMANS: She cracked you in the head with that?

DEFENDANT: Mmmhmm.

VEKEMANS: It was a pretty nasty fight, huh?

DEFENDANT: Mmmhmm.

VEKEMANS: How did that fight end?

DEFENDANT: [No response.]

VEKEMANS: Jeff, I know we're not beating around the bush here. I mean, we all know what we're talking about.

DEFENDANT: I stabbed her.

¶ 60    The above exchange confirms that, at three distinct points during the interview—8:20:33, 8:22:20, and 8:22:37, defendant stated, "I really don't want to talk about it." In each instance, defendant shook his head from side to side which, again, is widely accepted to mean "no." These were not stray comments or vague expressions of discomfort, conversational hesitation, or a "reluctance in describing how he brutally stabbed his aunt," as the State argues on appeal. The timing and context of these statements underscore their legal significance. In each instance, defendant's statements were in direct response to a pointed question concerning what transpired

when he arrived at Wilcox's residence on the night of her murder. The questions did not seek "particular details" of the murder, but rather, sought an initial confession. Defendant's statements were remarkably consistent and clear, because he uttered the exact same phrase, "I really don't want to talk about it," three times within a roughly two-minute timespan. Just as in defendant's first invocation of his right to remain silent at the very beginning of the interrogation, there is nothing ambiguous about these statements. They were timely, specific, and unambiguous invocations of his right to remain silent.

¶ 61    Instead of scrupulously honoring that right and immediately ending the interview, the investigators acknowledged defendant's statements and pressed forward. Their responses, though couched in empathetic language, subtly redirected the conversation rather than ended it. Vekemans responses, "No, I understand. But what made you snap?" and "What happened when you got inside?" were not general inquiries, but targeted efforts to elicit a narrative of the murder. LeMons echoed this approach, stating that she did not "blame" defendant, that defendant "got fucked by everybody," and that she understood why defendant "did it." These comments were not neutral acknowledgements, but rather, were strategic attempts to steer the conversation back toward the offense and elicit inculpatory statements, notwithstanding defendant's repeated invocations of his right to silence.

¶ 62    The State relies on *People v. Aldridge*, 79 Ill. 2d 87 (1980) and *Kronenberger*, 2014 IL App (1st) 110231, to argue that the trial court's suppression ruling should be reversed. In *Aldridge*, the defendant was charged with murder and subsequently approached a jailer, indicating that he wished to confess. *People v. Aldridge*, 68 Ill. App. 3d 181, 184 (1979). Defendant was advised of his *Miranda* rights and signed a waiver. Several times during the interrogation, defendant refused to provide certain details of the offense, but the officers nevertheless continued to question

him. The statements relied on by the defendant in arguing for suppression included: "so anyway have you got enough?" "I think you got enough, you got the story now," and "Look, you've got enough details right now that fits the crime so let's hang this up." *People v. Aldridge*, 68 Ill. App. 3d 181, 186 (1980). Based on these and other similar comments, the defendant argued before the appellate and supreme court that he had invoked his right to remain silent. In affirming the appellate court and rejecting defendant's argument that his confession should have been suppressed, our supreme court concluded that these statements reflected mere resistance to "answering questions concerning particular details of the offense to which he had confessed" rather than "attempting to terminate the questioning altogether." *Aldridge*, 79 Ill. 2d at 95.

¶ 63    In *Kronenberger*, 2014 IL App (1st) 110231, ¶ 36, the defendant provided information in a videotaped interview with a detective concerning a homicide but denied that he was the shooter. The detective left the interrogation room and returned ten minutes later. *Id*. Upon return, the detective asked defendant whether he needed to use the restroom, and defendant shook his head. At that point, the detective asked, "No? Are you done talking to me? Are you done talking to all of us?" and defendant responded "yeah." *Id*. In affirming the trial court's ruling denying the defendant's motion to suppress, the court examined the context of the entire conversation and concluded that the defendant did not unambiguously invoke his right to silence. *Id*. ¶ 37. The court noted that the defendant had provided information regarding the offense earlier in the interview, and it was "unclear from the defendant's response whether he wished to invoke his constitutional right to silence or whether he, after having spoken to [a detective] in the earlier 14-minute conversation, had nothing else to tell the detectives." *Id*.

¶ 64    The State argues that the instant matter is like *Aldridge* and *Kronenberger* because defendant's repeated statements, "I really don't want to talk about it," reflected only a "reluctance

to discuss the grizzly [*sic*] details" of the murder. It notes that defendant willingly discussed his family dynamics, ongoing legal problems, and even his whereabouts on the day of the murder, and his statements regarding what transpired when he reached Wilcox's residence reflect "that he simply did not want to provide further details about the actual murder itself."

¶ 65   The State's argument is unavailing because, unlike in *Aldridge* and *Kronenberger*, defendant had neither confessed nor made any inculpatory statements by that point. Until the point that the investigators asked defendant what occurred when he arrived at Wilcox's home, the interview centered on defendant's relationship with his sister, Diana, his financial difficulties, the family strife that followed his mother's passing, and the circumstances leading to his recent incarceration. Indeed, until this part of the interview, Wilcox was mentioned only briefly—when defendant noted that she controlled his mother's trust, that she "sided" with Diana, and that Wilcox had paid defendant's former attorney with funds that defendant had inherited from his Aunt Maxine. Importantly, when defendant stated that he did not "want to talk about it," the subject of Wilcox's murder had not yet come up. It is illogical for the State to suggest that defendant was declining to discuss "details" of a topic that had not yet been introduced. Defendant's statements were not a refusal to elaborate, but rather, they were a clear effort to end the questioning altogether.

¶ 66   The State also relies on two unpublished cases in support of its position, but that reliance is misplaced for the same reasons as discussed above. In *People v. Simmons*, 2021 IL App (1st) 181351-U, ¶¶ 52-53, the court held that, when viewed in proper context, most of the defendant's purported invocations, including "I just don't want to say anything," and "I don't even want to talk to ya'll [*sic*] anymore," were isolated, equivocal statements that did not qualify as invocations of the right to silence. There, the defendant continued "speaking immediately after making such statements, including asking questions himself of the detectives right after supposedly invoking

his right to remain silent." *Id*. ¶ 52. In essence, the defendant reinitiated the dialogue and undermined his own claim that he wished to remain silent.

¶ 67    In *People v. Harris*, 2023 IL App (1st) 191916-U, ¶ 62, the appellate court determined that the defendant's statement that he was "done talking" was not a clear invocation of his right to silence. The court noted that one of the detectives had, "almost reflexively" asked defendant, "Why?" which the court stated was reasonable given that the defendant had openly spoken with the detectives for "some time" after previously asserting he did not wish to talk because he feared his co-arrestees could overhear him from adjacent interview rooms. *Id*. Relying on *Kronenberger*, 2014 IL App (1st) 110231, the court concluded that the defendant's statement was ambiguous and did not reflect a desire to cease all questioning. *Id*. ¶ 66. It emphasized that defendant had participated in the conversation for more than 20 minutes, where he gave inculpatory statements, and it was unclear whether defendant wished to remain silent or simply "had nothing else" to say. *Id*. It also noted that, when detectives prompted the defendant by asking him "why" he was "done talking," defendant did not invoke his right to silence, but rather, stated that he did not believe his co-arrestees would exculpate him. *Id*. ¶¶ 62, 66.

¶ 68    The defendants in *Simmons* and *Harris*, unlike in the instant matter, had already made inculpatory statements before expressing a desire to stop the interrogation. In both cases, the defendants' remarks were made mid-interrogation, during a lengthy, voluntary dialogue and lacked clarity as to whether the remarks were intended to terminate all questioning. Here, by contrast, defendant did not speak about the offense immediately after stating "Not really. I don't have nothing to say," which he stated immediately after receiving the *Miranda* warnings and before questioning began. That remained true later in the interview, when he said, "I really don't want to talk about it," three times in quick succession, and each time in direct response to the investigators'

targeted questions regarding the offense. Defendant also shook his head—an accompanying nonverbal cue indicating "no." He never asked the investigators for details concerning their investigation and did not otherwise suggest a willingness to assist them. Critically, defendant had not confessed or even discussed the murder at the time he declined to speak about the offense, making his refusal a broad invocation of the right to silence rather than a reluctance to elaborate. His statements were repeated and consistently offered in direct response to pointed questions concerning the murder.

¶ 69    We agree with the trial court that defendant unequivocally and unambiguously invoked his right to remain silent four separate times during the videotaped interview—prior to making any inculpatory statements, but the investigators failed to scrupulously honor that right. Accordingly, the trial court correctly granted defendant's motion to suppress and denied reconsideration.

¶ 70                                III. CONCLUSION

¶ 71    For the above reasons, we affirm the orders of the Lake County circuit court granting defendant's motion to suppress statements and denying the State's motion to reconsider.

¶ 72    Affirmed.