2026 IL App (2d) 250165-U
No. 2-25-0165
Order filed February 17, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant,
v. JAMES R. JOHNSON, Defendant-Appellee.

Appeal from the Circuit Court of Kane County.
Honorable John A. Barsanti, Judge, Presiding.
No. 23-CF-990

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Probable cause existed to arrest defendant for driving while under the influence of drugs where, *inter alia*, (1) he was found asleep behind the wheel of a vehicle parked, with its engine running, next to a gas pump; (2) after being awakened by officers, he slurred his speech and behaved bizarrely; (3) when he exited the vehicle, officers observed two pipes they recognized as the type used for crack cocaine; and (4) his performance on field-sobriety tests indicated possible impairment.

¶ 2    Defendant, James R. Johnson, was arrested for driving under the influence of drugs. Contraband was recovered during an inventory search of his vehicle. He subsequently filed a motion to suppress, arguing that the police did not have probable cause to conduct the warrantless search. The circuit court of Kane County granted the motion. The State appeals, arguing that the warrantless search was justified because (1) the police had probable cause to believe that the

vehicle contained contraband and, alternatively, (2) the police had probable cause to arrest defendant for driving under the influence and were thus authorized to conduct an inventory search of the vehicle. We reverse.

¶ 3                                    I. BACKGROUND

¶ 4       On May 13, 2023, at approximately 4 a.m., police responded to a dispatch call regarding a driver who was apparently asleep at the steering wheel of a car parked next to a gas pump at a gas station in North Aurora. After police arrived, they woke the individual—later identified as defendant—and asked him to step out of the car. The police administered several field-sobriety tests, then placed defendant under arrest and searched his car. Defendant was subsequently charged by indictment with five drug-related offenses. Count I charged defendant with unlawful possession with intent to deliver 15 grams or more but less than 100 grams of cocaine (720 ILCS 570/401(a)(2)(A) (West 2020)). Count II charged him with unlawful possession with intent to deliver 1 gram or more but less than 15 grams of cocaine (*id.* § 401(c)(2)). Counts III and IV charged him with unlawful possession of less than 15 grams of clonazepam and less than 15 grams of oxycodone, respectively (*id.* § 402(c)). Count V charged him with driving under the influence of drugs and/or cocaine and/or cannabis (625 ILCS 5/11-501(a)(4), (c)(1) (West 2020)).

¶ 5       Defendant retained private counsel, who filed a "Motion to Suppress Non-Warrant Search of Vehicle." Defendant argued in the motion that the initial search of his car was conducted "without [a] warrant, without consent, not incident to an arrest, and not subject to a tow," and that the vehicle search warrant obtained by police the following day was "based upon the Fourth Amendment violation" of the initial search. Defendant asked the trial court to suppress all evidence that had been obtained from his vehicle, "including but not limited to green leafy substance, white rock like substance, unknown brown powdery substance, eight (8) blue round

pills, four (4) green round pills, three (3) glass pipes with residue, and one glass pipe without residue." "All of these items," defendant asserted, "[were] seized without [a] warrant, without consent, and not incident to a lawful arrest."

¶ 6    On December 19, 2024, the trial court held a hearing on defendant's motion to suppress evidence. The defense called defendant as a witness, who testified to the following. At around 4 a.m. on May 13, 2023, he was the sole occupant of a car parked at a Thornton's gas station in North Aurora. Defendant was "directed to exit that vehicle," and soon thereafter, "the vehicle [was] searched by officers of the North Aurora Police Department." Defendant did not consent to that search, and the police did not have a warrant to search the vehicle or to arrest defendant. The police found "contraband" during the search.

¶ 7    On cross-examination, defendant said that he arrived at the gas station around 3:45 a.m., intending to buy gas and water. He was asleep in his car when the police arrived, and he was holding about $200 in his hand. There was additional cash in the vehicle, but defendant did not know how much because the cash was in two donation boxes used to raise funds for his mother's illness. When asked whether there was contraband in the car, defendant said, "Not that I know of, no. On my person, yes; but not in the vehicle, no." Defendant denied telling the officers he had removed cannabis from a dispensary bag and placed it in the trunk, but he agreed that, before his arrest, he told the officers that he had smoked cannabis. He testified that other people had used his car and that some items inside did not belong to him. When asked about the sobriety tests he performed at the scene, defendant confirmed that he understood the instructions while performing the tests, "except for the last part." When asked for clarification, defendant said that the officer told him to stand on one foot, but never told him "[f]or how long." When asked about a

conversation he had with officers about a glass pipe, defendant said it was difficult to recall small details because the incident happened a long time ago.

¶ 8 On redirect examination, defendant explained that, at the time of the police encounter, his mother had recently suffered a heart attack. Earlier that day, his wife had used the car to pick up donation boxes that had been placed at stores and apartment complexes around the neighborhood to raise money to pay his mother's bills. He said that he had intended to buy distilled water at the gas station because his mother was coming home and needed distilled water for her oxygen tank. Asked whether the police *Mirandized* him (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) when he spoke to them outside the car, defendant said no.

¶ 9 After defendant's testimony concluded, the trial court found that defendant had made a *prima facie* case that evidence was illegally seized and that the burden had shifted to the State.

¶ 10 The State then called North Aurora police officer Cody Klingberg as a witness. Klingberg testified that he had been a patrol officer for nine years, first in Montgomery and then in North Aurora. He said that he was trained in the detection and apprehension of drivers under the influence, that he had multiple refresher trainings in standard field-sobriety tests, and that he was "ARIDE certified." (ARIDE is an acronym for Advanced Roadside Impaired Driving Enforcement.) He explained that ARIDE training is specialized training for "the detection of any type of drug in the system." During his time as a patrol officer, he participated in more than 100 driving-under-the-influence investigations.

¶ 11 Klingberg went on to testify that, on May 13, 2023, at approximately 4 a.m., he responded to a dispatch call regarding "a slumped driver at a gas station" in North Aurora. When he arrived at the scene, he observed a vehicle matching the reported description. The vehicle was parked at a gas pump, its engine was running, and its headlights and taillights were on. An individual later

identified as defendant appeared to be sleeping in the driver's seat. His chin was resting on his chest, and he was not moving. His hands were in his lap, and he had money in his hands. Klingberg and other responding officers shined their flashlights into the vehicle, but defendant did not respond to the lights. Klingberg saw a black bag in defendant's lap, and a small glass pipe, approximately four to five inches long, on the front passenger seat. When Klingberg saw the pipe, he believed, based on his training and experience, that it was used for smoking crack cocaine.

¶ 12    After seven or eight minutes at the gas station, Klingberg woke defendant by knocking on the driver's side window. Defendant opened the car door. Klingberg spoke to defendant, who had slurred speech and "was kind of confused." Klingberg saw another small glass pipe in the inside handle of the driver's door. Klingberg believed, based on his training and experience, that this pipe was also used for smoking crack cocaine. Klingberg asked defendant to step out of the car and asked him why he was at the gas station. Although defendant said he was there pumping gas, Klingberg noticed that the gas pump hose was not connected to the car. When Klingberg asked if he had consumed any drugs or alcohol, defendant said no. Klingberg inquired, "[M]ind if I check you real quick?" Defendant "was okay with that," and said that he had smoked some marijuana "yesterday." Defendant agreed to undergo field-sobriety tests, which were administered under the "overhang" at the gas station. The area was level, free of debris, and well lit.

¶ 13    Klingberg first administered the horizontal gaze nystagmus (HGN) test, which tests for alcohol, not drug, consumption. During the test, he observed zero of six "standardized clues." However, he noted that he had instructed defendant to keep his head still during the test, but defendant failed to do so, even after being reminded "[a]t least once."

¶ 14    Before the walk-and-turn test, Klingberg asked defendant if he had any physical problems that would prevent him from performing the test. Defendant said no, but asked if he could tie his

shoe first. Klingberg agreed, then gave instructions for the test and demonstrated the test. Klingberg testified that, for this test, showing at least two out of eight standardized clues would indicate possible impairment. Defendant "broke stance" and "missed heel to toe," for a total of two clues.

¶ 15 Klingberg next gave instructions for the one-leg-stand test and demonstrated the test. Showing at least two out of four standardized clues would indicate possible impairment, and Klingberg observed three clues: defendant used his arm to balance, put his foot down, and swayed. When asked, "Overall[,] based on all of your observations of the defendant up to that point, how would you describe his balance?" Klingberg replied, "Did not have good balance."

¶ 16 Next, Klingberg administered the "lack of convergence test," which he explained shows "a type of ingestion of a drug." Klingberg learned to administer the test during his ARIDE training. Klingberg explained the test and defendant's performance as follows:

> "Q. What are you looking for during that test?
>
> A. Looking for equal tracking of the eyes and then to see if both eyes converge in together.
>
> Q. And after—or while administering that test, what if anything did you notice?
>
> A. His eyes did not converge at the end of the test.
>
> Q. Based on your training, what does that indicate?
>
> A. That he had some type of drug in his system.
>
> Q. Can you explain for us how you do the test, how you administer it?
>
> A. You hold your [index] finger up 12 to 15 inches away [from the subject's face]. You check for equal tracking. You go around twice. And then you go in towards the tip of their nose without touching it.

\*\*\*

Q. Then you made a circular motion around your face?

A. Two times around his. If he follows it with his eyes, then you go into his nose.

Q. When you go into the nose, is that when you're looking for convergence?

A. Yes, both eyes are supposed to go in."

¶ 17 After the convergence test, Klingberg asked defendant what drugs he had taken. Defendant said that he had smoked some marijuana. Finally, Klingberg had defendant take a breathalyzer test, which tests for alcohol but not drugs. The breathalyzer test result showed "zeros." When asked if there was anything illegal in the car, defendant said that there was marijuana from a dispensary that was "not bagged up."

¶ 18 Klingberg testified that defendant was arrested for driving under the influence of drugs. Klingberg's opinion at the scene was that defendant was under the influence of drugs was "[b]ased on him passed out at the wheel, not waking up to the light, had to knock on the window, his slurred speech talking to him, the confusion, his balance, the lack of convergence test, and also him admitting to smoking [marijuana] the day prior." Upon further questioning, Klingberg confirmed that he also considered the glass pipes on the front passenger seat and in the driver's door, as well as the results of the standardized sobriety tests. Klingberg believed that defendant was unfit to drive.

¶ 19 Klingberg testified that North Aurora had an ordinance requiring vehicles to be towed following an arrest for driving under the influence. The North Aurora Police Department also had a policy of towing vehicles following an arrest for driving under the influence. That policy required an inventory search before towing, to look for hazards and valuables in the vehicle. After defendant's arrest, his vehicle was searched. The search turned up the following: three glass pipes

with residue, one glass pipe without residue, four green pills, four blue pills, 0.9 grams of an unknown brown powdery substance, 15 grams or more of a white rock-like substance that later tested positive for cocaine, and approximately 65 grams of a green leafy substance that later tested positive for cannabis. The police later obtained a search warrant, and in the subsequent search, the police discovered more than $6,000 in United States currency. Also, bags of cocaine were located in a compartment near the steering wheel.

¶ 20　On cross-examination, Klingberg agreed that defendant did not appear to have balance issues when getting out of the car, turning around, or tying his shoe. He conceded that the glass pipe found on the passenger seat had no residue and that the pipe itself was not contraband. He confirmed that he never saw any drugs or smelled any drugs. He agreed that a certain percentage of the population has eyes that "just can't converge," and that he did not know whether that applied to defendant. On redirect examination, Klingberg confirmed that, as his written report reflected, there was residue inside the glass pipe he observed in the driver's door handle. Klingberg also stated that, before administering the HGN test, he asked defendant whether he had any issues with his eyes, and defendant said no.

¶ 21　During the suppression hearing, the State played 27 minutes and 40 seconds of video from Klingberg's body camera, beginning when he arrived at the gas station at 4:15 a.m. and ending with defendant's arrest at 4:42 a.m. At the start of the video clip, Klingberg and then another responding officer approach the car and use flashlights to examine the interior. Very loud music can be heard blaring over the gas station's speakers. One of the officers says that he asked for the volume of the music to be turned down, and the music is soon turned off. After nine minutes, Klingberg knocks on the window of the driver's side door, waking defendant. Defendant opens the door. He appears confused, and his speech is mumbled. He says he was pumping gas, and

Klingberg replies that defendant was asleep in the car. Defendant appears more lucid as the conversation continues, but his speech is still slurred. When officers ask if they can pat him down, defendant repeatedly says, "I rather not be touched." Defendant offers to lift up his shirt. Once he lifts up his shirt, an officer asks him to spin around, and he complies. In response to questions about whether he has any knives or sharp objects in his pants, defendant turns his pockets inside out and then pulls down his pants, exposing his underwear. When an officer says, "You don't need to do that," defendant pulls his pants back up. He states that his mother was recently released from the hospital and that he is "just exhausted." He states that he smokes marijuana and last smoked it the morning before. He also states that he takes prescribed methadone because he had "a small heroin problem back in the day"; he last took a dose of methadone at 2:05 p.m. the day before. His face is not visible during the HGN or convergence tests. Before the walk-and-turn and one-leg-stand tests, defendant confirms that he has no physical conditions that might impede his performance. He is mostly on-camera for those tests (though his feet are not always visible); his performance on those tests appears consistent with Klingberg's assessment. Defendant is off-balance during the latter part of the walk-and-turn test. On the one-leg-stand test, each of his first three attempts fails after fewer than five seconds; on the fourth attempt, he holds the position for about eight seconds before Klingberg stops the test. During all of these attempts, defendant holds his arms out, contrary to the directions. After the sobriety tests, this exchange takes place:

"Klingberg: Since you're being 100 percent honest, is there anything illegal in the car?

Defendant: No [unintelligible] my methadone, that's it, [unintelligible] marijuana and it's not bagged up but, it's in the trunk, and that's it, you know, like that's maybe.

Klingberg: Methadone's in the trunk or weed's in the trunk?

Defendant: The methadone is at home and the weed is probably in the trunk.

Officer 2: How much weed are we talking?

Defendant: Like an eighth of weed, like ten dollars.

Officer 2: Just a little bit?

Defendant: Yeah. I go to the dispensary but I took it out of the bag, you know?

Klingberg: It was from the dispensary but you took it out of that, that bag?

Defendant: Yeah. Other than that, it's probably in the trunk, somewhere in the trunk."

¶ 22 Next, the officers repeatedly ask to search the vehicle, and defendant repeatedly refuses to consent. During those discussions, an officer out of frame asks, "What would you say if I said [unintelligible] a crack pipe in the driver's side door? A used crack pipe?" Defendant replies, "I would say it's a marijuana pipe," and the officer says, "Marijuana's not white." After defendant again declines to consent to a search, the officers arrest him and place him in handcuffs. The rest of the video shows defendant being searched, his car being searched, and Officer Klingberg *Mirandizing* him (see *Miranda*, 384 U.S. 436).

¶ 23 After the State rested, the trial court heard closing arguments from the parties. The State argued two separate bases for the police to search defendant's vehicle: (1) probable cause to believe that the vehicle contained contraband and (2) probable cause to arrest defendant for driving under the influence, after which the police were authorized to conduct an inventory search of the vehicle. The State said:

"Your Honor, the defense is only challenging the search of the car.[1]  The search of

the car was legal for two different reasons.  The first is that the police observed these glass

smoking pipes inside the car before searching; one on the front passenger seat while the

defendant was still passed out, and one in the driver's door when the door was opened

initially.

The observations of those glass smoking pipes being items of drug paraphernalia

combined with the officer's testimony about his training and experience in recognizing

them as drug paraphernalia give the police probable cause to search every part of that

vehicle and every container in it that might conceal narcotics.  Additionally, the search of

the car was legal based on probable cause [to] arrest for [driving under the influence] and

a tow following that arrest and then an inventory search pursuant to the policy of the North

Aurora Police Department."

The State then elaborated on its theory that the police had probable cause to conduct a warrantless

search of the car.  The State reiterated Klingberg's testimony, noting that Klingberg observed the

small glass pipes before defendant got out of the car.  The State cited *People v. Schrems*, 224 Ill.

App. 3d 988, 998 (1992), explaining that, in *Schrems*, an officer's observation of narcotics

paraphernalia, in conjunction with the officer's training and experience regarding narcotics

paraphernalia, provided probable cause to search the entire vehicle for narcotics.  The State also

---

[1]A complaint for search warrant signed by North Aurora police officer Ryan Peat states that, after

defendant was arrested for driving under the influence, but before he was placed in the squad car for

transport, he "was searched and checked for weapons.  During that search, a small baggy that field tested

for crack along with a glass pipe used for smoking crack cocaine was located in his right jacket pocket."

- 11 -

noted that defendant's statement regarding cannabis in the trunk supported probable cause to search the vehicle.

¶ 24 Following arguments, the trial court asked the State if the convergence test had "been Fryed in Illinois." See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The State did not know.

¶ 25 In the trial court's written decision granting the motion to suppress, the court listed these facts of the case, among others:

"Klingberg noticed a small glass pipe on the front passenger seat.

Klingberg testified he believed these types of pipes were used to smoke crack cocaine.

* * *

[After administering the field-sobriety tests], Klingberg asked the [d]efendant if there was anything illegal in the car.

The [d]efendant responded, 'Yes.' He explained he had obtained cannabis from a dispensary, and he took it out of the bag.

Also, before the arrest, another officer stated he saw a glass pipe in the driver's door. The [d]efendant responded he didn't know, but it probably was a marijuana pipe."

¶ 26 In its analysis and conclusion, the trial court stated, *inter alia*:

"The walk-and-turn test and the one-leg stand test were obscured by the officer's body when they were being conducted.

The [c]ourt could not corroborate the officer's grading of tests, as they could not be seen.

* * *

The only observable evidence of the [d]efendant's possible impairment was his falling asleep behind the wheel of a non-moving, safely parked vehicle.

The field tests were unobservable with alleged minimal infractions and uncorroborated.

The convergence test was presented without sufficient foundation and information to be admissible.

The HGN test and portable breath test were both negative for alcohol.

The [d]efendant, while conversing with police, was not confused, physically uncoordinated, or combative.

\* \* \*

*Schrems* was decided long before the legalization of cannabis in Illinois.

Possessing a glass pipe can no longer be the basis to justify a search of a vehicle. It is legal to possess cannabis and legal to possess the paraphernalia to smoke cannabis.

\* \* \*

The evidence at the hearing did not establish probable cause to arrest the [d]efendant for driving under the influence or for possessing drug paraphernalia.

Also, any items seized as the result of the following inventory search of the [d]efendant's vehicle are suppressed as a result of the [d]efendant's illegal arrest."

¶ 27 In its motion to reconsider, the State asserted that "there was probable cause to arrest defendant for the improper transportation of marijuana \*\*\* and there was probable cause to search the vehicle based upon the observation of the glass pipes and defendant's behavior at the time the glass pipes were observed." The State further argued that

"[a] reasonably cautious person would have believed that defendant committed a crime when defendant told the police that he had marijuana that was open—not bagged up—in the trunk of his car. (Transcript at 50); (People's [e]xhibit [No.] 1 at 24:03) It is illegal to transport marijuana in a vehicle unless it is in a secured, sealed or resealable, odor-proof container. 625 ILCS 5/11-502.1 & 11-502.15 [West 2020]."

¶ 28    In its decision denying the motion to reconsider, the trial court stated:

"The [c]ourt's decision was based on the State's inability to convince this court that the police had probable cause to arrest the defendant. *** As the [c]ourt stated previously, the evidence and testimony presented at the hearing failed to convince this court of probable cause that the defendant was driving under the influence of drugs."

The court also found that the State "proposed new arguments" after the hearing and that "[n]o evidence was presented establishing improperly packaged cannabis or illegal use or possession of the glass pipes."

¶ 29    This timely appeal followed.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, the State argues that the trial court's suppression ruling was against the manifest weight of the evidence for two separate and distinct reasons: (1) there was probable cause to search defendant's car under the automobile exception after he admitted that there was cannabis in the trunk that was not in a sealed container; and (2) there was probable cause to arrest defendant for driving under the influence of drugs (DUI), and the subsequent vehicle search was a legal inventory search conducted according to department policy following defendant's DUI arrest. Later in its argument, the State cites the crack pipe with residue as contributing to probable cause to search. In response, defendant argues that the State forfeited its argument that there was probable cause to

search defendant's car based on his statement about unbagged cannabis in the trunk. Defendant further states that, forfeiture aside, the argument that probable cause existed to conduct a search under the automobile exception is meritless. Defendant also argues that the trial court's ruling that there was no probable cause to arrest defendant was not against the manifest weight of the evidence. Because we find that there was probable cause to arrest defendant for DUI, we decline to consider whether police had probable cause to search the vehicle under the automobile exception.

¶ 32     A trial court's ruling on a motion to suppress presents a mixed question of law and fact, so we apply a bifurcated standard of review. See *People v. Rivera*, 227 Ill. 2d 1, 11 (2007). Under the two-part standard adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996), "we give deference to the factual findings of the trial court, and we will reject those findings only if they are against the manifest weight of the evidence." *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). Our deference to the factual findings of the trial court "is grounded in the reality that the [trial] court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Jones*, 215 Ill. 2d 261, 268 (2005). For that reason, "a reviewing court may conduct *de novo* review of a trial court's factual findings when those findings are based entirely on videotaped evidence." *People v. Thrall*, 2025 IL App (2d) 240433-U, ¶ 39. But, when (as here) "the trial court has heard live testimony [and also viewed video evidence] relating to a disputed issue of fact," deferential review of the court's factual findings is required and we will not disturb those findings unless they are against the manifest weight of the evidence. See *People v. Valle*, 405 Ill. App. 3d 46, 56-58 (2010). "A finding is against the manifest weight of the evidence only if the finding is unreasonable,

arbitrary, or not based on the evidence, or if the opposite conclusion is clearly evident." *Thrall*, 2025 IL App (2d) 240433-U, ¶ 39.

¶ 33 Nonetheless, "a reviewing court remains free to undertake its own assessment of the facts in relation to the issues, and we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." (Internal quotation marks omitted.) *Johnson*, 237 Ill. 2d at 88-89. Under the *de novo* standard, we give no deference to the trial court. *People v. Williams*, 2013 IL App (1st) 111116, ¶ 75.

¶ 34 The State argues that the vehicle search was justified because there was probable cause to arrest defendant for DUI, and the police, per department policy, inventoried the vehicle's contents. As our supreme court has explained,

"An arrest executed without a warrant is valid only if supported by probable cause. [Citation.] Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. [Citation.] In determining whether the officer had probable cause, his factual knowledge, based on law enforcement experience, is relevant. [Citation.] The existence of probable cause depends upon *the totality of the circumstances at the time of the arrest*. [Citation.] Whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." (Emphasis added.) *People v. Grant*, 2013 IL 112734, ¶ 11.

" '[P]robable cause does not require an officer to rule out any innocent explanations for suspicious facts.' " *People v. Molina*, 2024 IL 129237, ¶ 22 (quoting *People v. Hill*, 2020 IL 124595, ¶ 24).

¶ 35 Here, probable cause to arrest defendant for DUI required facts and circumstances that would lead a reasonably cautious police officer to believe that defendant was "under the influence of any *** drug or combination of drugs to a degree that render[ed] [him] incapable of safely driving[.]" See 625 ILCS 5/11-501(a)(4) (West 2020).

¶ 36 We begin with issues concerning the relevancy of certain field-sobriety tests that Klingberg conducted. According to Klingberg's testimony, some of those tests were designed to test exclusively for alcohol impairment. For instance, he first administered the HGN test, which he testified was designed to detect alcohol consumption, not drugs. So the fact that Klingberg observed zero of six standardized clues is not relevant to the question of whether defendant was under the influence of drugs. Similarly, Klingberg explained that a breathalyzer test detects only alcohol consumption, so the fact that defendant blew "zeros" is not relevant.

¶ 37 As for the convergence test, the State argues that the trial court erred when it disregarded that test's results based on the State's failure to lay a proper foundation. The State reasons that (1) defendant did not object to that evidence during the suppression hearing and (2) the rules of evidence do not apply at pretrial hearings such as suppression hearings. See *In re Kendale H.*, 2013 IL App (1st) 130421 ¶ 30; Ill. R. Evid. 104(a) (eff. Jan. 1, 2011).

¶ 38 In response, defendant argues that, despite his failure to object, "the trial court was under no obligation to consider the convergence test results." See Ill. R. Evid. 104(a) ((eff. Jan. 1, 2011) ("the admissibility of evidence shall be determined by the court")). Defendant asserts that the trial court's decision to disregard the convergence test "was not whimsical or arbitrary, as Klingberg laid no foundation for its admission and the State did not even know whether [the convergence test] had previously been the subject of a *Frye* hearing." In support of its position, defendant cites *People v. Kavanaugh*, 2016 IL App (3d) 150806, ¶¶ 20, 28, where the defense "strenuously

objected" to the officer's testimony about administering the convergence test, and the appellate court upheld its exclusion, concluding that "[t]he State failed to adequately demonstrate a scientific basis for the convergence test." The court noted, for instance, that the testifying officer admitted that some of the population "were unable to do a convergence test." *Id.* ¶¶ 15, 28.

¶ 39 We need not decide whether the trial court erred by disregarding the results of the convergence test. First, no evidence was presented to suggest that the test results could indicate whether defendant was incapable of driving safely. So even if we presume that the convergence test showed that defendant had drugs in his system, the test would have no bearing on whether defendant was incapable of safely driving, which is an element of the offense.

¶ 40 Second, there was sufficient evidence of defendant's drug consumption and impairment aside from the convergence test. Relevant to drug consumption, defendant stated that he had consumed marijuana the day before, and that he had unbagged cannabis in the trunk of the car. In addition, responding officers observed two glass pipes in plain view and—based on their experience and training—were able to identify those pipes as the type customarily used to smoke crack cocaine. Although such a pipe may not itself be contraband, "a law enforcement officer may rely on training and experience to draw inferences and make deductions that might well elude an untrained person." *Jones*, 215 Ill. 2d at 274.

¶ 41 Notably, on Klingberg's bodycam video, defendant claimed that the pipe found in the door handle was a "marijuana pipe," to which an officer replies, "Marijuana's not white"—referring to the color of the residue inside the pipe. Probable cause to search did not require the officers to rule out an innocent explanation—legal marijuana usage—for the pipes. See *Molina*, 2024 IL 129237, ¶ 22. Nor were the officers required to *know* that these pipe had been used to smoke crack cocaine. "Probable cause, *i.e.*, sufficient evidence to justify the reasonable belief that the defendant

has committed or is committing a crime, 'does not demand any showing that such a belief be correct or more likely true than false.' " *Jones*, 215 Ill. 2d at 277 (quoting *Texas v. Brown*, 460 U.S. 730, 731, 742 (1983)). See *id.* at 278-82 (officer had probable cause, based on his training and experience, to believe that small wooden box observed in the defendant's shirt pocket was a " 'one-hitter' box" commonly used to store cannabis).

¶ 42    As for impairment, the trial court found that "[t]he only observable evidence of the [d]efendant's possible impairment was his falling asleep behind the wheel of a non-moving, safely parked vehicle," and the court noted that the bodycam video showed that defendant "was not confused, physically uncoordinated, or combative." However, underlying these findings was the trial court's disregard of the results of the walk-and-turn test and the one-leg-stand test. The court reasoned that the tests were not sufficiently captured on video to corroborate Klingberg's testimony. This was error. Klingberg's bodycam video adequately depicted the tests and supported his testimony about their results. For the walk-and-turn test, where two out of eight clues could indicate impairment, Klingberg observed two clues. For the one-leg-stand test, where two out of four clues could indicate impairment, Klingberg observed three clues. We cannot agree with the trial court that defendant's failures on the one-leg-stand were "minimal" where defendant held out his arms during the entire test, swayed, and failed three times to hold the position for even five seconds. We recognize that defendant did not appear off-balance during the remainder of the encounter at the gas station; for instance, he was able to remove and replace his shoe without stumbling. However, "the State need not have proved that [the] defendant was completely incapacitated by [drugs]; rather, the State had to demonstrate that [the] defendant was impaired by [drugs] only to the extent that it rendered him incapable of driving safely." *People v. Tatera*, 2018 IL App (2d) 160207, ¶ 29. The standardized field-sobriety tests conducted by Klingberg were

tailored to measure a person's capacity for driving. Based on those measurements, the bodycam video supports Klingberg's assessment that defendant "[d]id not have good balance."

¶ 43    Defendant relies on *People v. Day*, 2016 IL App (3d) 150852, and *People v. O'Brien*, 227 Ill. App. 3d 302 (1992), to assert that defendant's infractions on the walk-and-turn test and the one-leg-stand test fall short of probable cause to arrest for driving under the influence. In both cases, the reviewing court affirmed the trial court's finding that probable cause to arrest the defendant was lacking. See *Day*, 2016 IL App (3d) 150852, ¶¶ 38, 40-41; *O'Brien*, 227 Ill. App. 3d at 307-08. However, both cases are distinguishable from the facts here.

¶ 44    In *Day*, the reviewing court determined that the field-sobriety-test results carried little weight because the officer had the defendant perform them "on a wet surface while it was raining." *Day*, 2016 IL App (3d) 150852, ¶ 32. And even under those unfavorable conditions, the defendant managed (1) to stand on one leg for 30 seconds, without using his arms for balance, and put his foot down only once; and (2) to walk a straight line for 18 steps without walking off the line. *Id.* ¶ 31. In *O'Brien*, the trial court found that the officer lacked credibility due to his demeanor while testifying and his " 'convenient' " memory lapses. *O'Brien*, 227 Ill. App. 3d at 304-05. The reviewing court upheld that credibility determination and thus did not consider the officer's account of the field-sobriety tests. *Id.* at 307. Instead, the court relied on the defendant's account of the tests. *Id.* The defendant testified that he failed the one-leg-stand test because he was required to perform it on his driveway, which was pitched at a 45-degree angle. *Id.* at 304. He also testified that "he had completed half of the walk and turn test when [the officer] arrested him." *Id.*

¶ 45    Here, in contrast to *Day* and *O'Brien*, defendant performed the field-sobriety tests on a dry, level, well-lit parking lot. Despite the optimal conditions, defendant performed the one-leg-stand

- 20 -

far worse than the defendant in *Day* and failed the test. Unlike the defendant in *Day*, defendant held out his arms during the entire test yet failed three times to hold the position for even five seconds.

¶ 46 Beyond the sobriety tests, there were other indicia of defendant's impairment. We cannot accept the trial court's finding that defendant was asleep in a "safely parked vehicle," where that vehicle was parked next to gas pumps with its engine running. Defendant had evidently fallen asleep abruptly, cash in hand. He remained in a deep sleep for nine minutes after Klingberg arrived at the scene, despite the blaring music playing on the gas station's speakers and the officers' flashlights shining into the interior of his car. When awakened, he was confused and mumbling. While conversing with Klingberg and the other officers, defendant slurred his speech. His behavior was at times unusual. For instance, in response to officers asking him if he had any knives or sharp objects in his pants, defendant pulled down his pants. Klingberg properly relied on the totality of the circumstances in concluding, based on his training and experience, that defendant was under the influence of drugs and incapable of driving safely. " '[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists.' " *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 78 (quoting *Ornelas*, 517 U.S. at 700). "With regard to drug intoxication, Illinois courts have generally held that the testimony of police officers that a defendant was under the influence of drugs would be sufficient, provided that the officers had relevant skills, experience, or training to render such an opinion." (Internal quotation marks omitted.) *Id.* ¶ 79.

¶ 47 We hold that Klingberg had probable cause to arrest defendant for DUI and that the trial court's conclusion to the contrary was erroneous. According to Klingberg, following defendant's arrest, his vehicle was inventoried per department policy and contraband was found. See *People*

*v. Hundley*, 156 Ill. 2d 135, 138 (1993) ("An inventory search is a judicially created exception to the warrant requirement of the fourth amendment."). No issue has been raised regarding the inventory search aside from the preceding arrest.

¶ 48                                  III. CONCLUSION

¶ 49     For the reasons stated, we reverse the judgment of the circuit court of Kane County.

¶ 50     Reversed.